[Cite as *State v. Macomber*, 2019-Ohio-77.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. John W. Wise, P. J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J. |
| | Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 2018 AP 04 0017 |
| MELLISA MACOMBER | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:       Criminal Appeal from the Court of Common Pleas, Case No. 2017 CR 03 0064

JUDGMENT:       Affirmed

DATE OF JUDGMENT ENTRY:       January 14, 2019

APPEARANCES:

For Plaintiff-Appellee

R. SCOTT DEEDRICK
ASSISTANT PROSECUTOR
125 East High Avenue
New Philadelphia, Ohio  44663

For Defendant-Appellant

AARON KOVALCHIK
116 Cleveland Avenue NW
Suite 808
Canton, Ohio  44702

*Wise, John, P. J.*

{¶1} Appellant Mellisa Macomber appeals her conviction on one count of complicity to burglary following a jury trial in the Tuscarawas County Court of Common Pleas.

{¶2} Appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶3} The relevant facts and procedural history are as follows:

{¶4} During the month of December, 2016, Devon Ferguson (then, Devon Belt) and her now husband, Robert Ferguson, Jr., were residing at 109 North High Street in the village of Port Washington. (T. at 132). During the two week period prior to December 21, 2016, Ms. Ferguson testified that she was working as a day care teacher in Bolivar. (T. at 133). She generally left her home at or before 5:55 am. (T. at 134). Her work hours varied, but during that time period, Ms. Ferguson generally returned home in the afternoon. (T. at 134). During that time period, Mr. Ferguson was working in Wheeling, West Virginia as a heavy equipment operator at a coal mine. (T. at 135, 145). He typically left home at or before 4:30 a.m. and generally returned home after 7:00 p.m. (T. at 135-136, 144-145). Both Mr. and Ms. Ferguson parked their vehicles in front of their home and typically entered and exited their home through the front door. (T. at 134-135, 136, 146-147).

{¶5} Mr. and Ms. Ferguson testified that on December 21, 2016, they each left home at their usual times of departure and in the usual manner. (T. at 136, 145-146). Ms. Ferguson arrived home around 6:00 p.m. (T. at 137). She unlocked the front door but was unable to push it open. (T. at 137). Ms. Ferguson was on the phone with Mr.

Ferguson, who told her to go sit in her car and wait until he got home. (T. at 137-138, 147). When Mr. Ferguson arrived home, he had to apply force to the door in order to open it. (T. at 138, 148). As the couple entered their home, they saw that their house was destroyed. (T. at 139.). Items were strewn about; it appeared that no cupboard, drawer, or closet had been left untouched. (T. at 139, 148). Once they went upstairs, Mr. and Ms. Ferguson noticed that items were missing from their home. (T. at 140, 149). Among those items were guns, Ms. Ferguson's laptop, jewelry, and clothes. (T. at 140, 149). Ms. Ferguson called the Port Washington Police Department to report the incident. (T. at 140, 149).

{¶6} Officer Jeff Stearns of the Port Washington Police Department responded to the residence in question on December 21, 2016. (T. at 154). According to Officer Steams, the perpetrators allegedly entered the home through the back door. (T. at 157, 158). There was an outside entrance to the basement that was screwed shut from the outside, but was broken from the inside out. (T. at 157).

{¶7} Officer Stearns speculated that the perpetrators exited the residence through that door with a hammer that officers found on the scene and collected into evidence. (T. at 157). The officers also collected one (1) Mountain Dew soda can inside the residence and another in the yard that reportedly did not belong to Mr. or Ms. Ferguson. (T. at 157-158, 166).

{¶8} Chief Paul Rossi of the Port Washington Police Department contacted the Tuscarawas County Sheriff's Office for assistance in the burglary investigation and Detective Jeff Moore began leading the investigation. (T. at 171). Detective Moore visited the scene of the burglary the morning after it occurred. (T. at 197). Detective Moore

observed that it was an allegedly different type of scene than most burglaries to which he responds, as it took place within a village in an area with high visibility and the front door was barricaded. (T. at 199-200). He noted that there were tire tracks in the backyard that looked as though a vehicle was backed up to the door. (T. at 201).

{¶9}   The two (2) soda cans that were collected at the scene were transported to the Bureau of Criminal Investigation and Identification (BCI) for DNA analysis. (T. at 172). The DNA analysis found an unknown male and an unknown female's DNA on the soda can found outside in the yard. (T. at 203).

{¶10}  The DNA analysis on the can that was found inside of the house resulted in a "hit" that lead to a suspect named Robert Miller. (T. at 173, 203-204). Detective Moore and Chief Rossi interviewed Mr. Miller on February 9, 2017, who admitted his involvement in the burglary of the Ferguson residence and identified the involved parties. (T. at 173-174, 204). Detective Moore and Chief Rossi decided to interview William Larrison and asked Officer Stearns to pick him up and bring him to the police station for questioning. (T. at 159, 207).

{¶11}  Officer Stearns retrieved William Larrison at his residence at 212 East Main Street. (T. at 160). Referencing a map, Officer Stearns testified that there is an alley, Diclar Lane, which connects the location of William Larrison's residence with the home of the Fergusons, about two (2) blocks away. (T. at 160-161). Detective Moore testified that during his interview with Mr. Miller, he referenced a "lane" that led from the residence at 212 East Main Street to the backyard of the Ferguson residence. (T. at 205-206). Detective Moore stated that the alley to which Officer Stearns referred and the lane described by Mr. Miller are one and the same. (T. at 206).

**{¶12}** At the police station, Detective Moore and Chief Rossi began questioning William Larrison until he terminated the interview upon his own volition. (T. at 207). Officers drove William Larrison home and then escorted his girlfriend, Ms. Macomber, of the same address, to the police station. (T. at 162-163, 207).

**{¶13}** Detective Moore and Chief Rossi conducted a recorded interview with Ms. Macomber, after which she provided the officers with a written statement. (T. at 175-178, 207-208). Both officers identified Ms. Macomber in court. (T. at 183, 207-208). Ms. Macomber stated that two or three days prior to the burglary, William Larrison told her to go down to the nearby church to use her Wi-Fi and to observe the Ferguson residence. (T. at 231, 243). She stated that the others showed up at the home on the morning in question when it was still dark, and proceeded to commit the burglary. (T. at 218, 232). Ms. Macomber told the officers that she observed the others wearing rubber gloves and masks as they walked out of the home. (T. at 230). They arrived back at her residence at staggered times, separated the property, and then took most of the property to the Cambridge area. (T. at 218-219, 230).

**{¶14}** After the questioning, Officer Stearns drove Ms. Macomber home and accompanied Detective Moore and Chief Rossi into the residence to allegedly retrieve some stolen property. (T. at 162, 180- 181). Ms. Macomber, visibly upset, initially gave the officers some property. (T. at 163, 181). When the officers asked Ms. Macomber if there was any additional property, she had a conversation with William Larrison, then proceeded to the bathroom and returned with more property to give the officers. (T. at 163, 181-184). The property included random items such as a hooded sweatshirt, glass cleaner, and a flashlight with a telescopic magnet on it. (T. at 163, 182). Ms. Macomber

did not produce any items of value, such as the missing guns, jewelry, or Ms. Ferguson's laptop. (T. at 188-189). Officer Stearns took the recovered items to the Ferguson residence, where Mr. and Ms. Ferguson identified them as items that were stolen from them. (T. at 142, 150, 164, 184).

{¶15} Based on Detective Moore's investigation at the scene of the crime on the morning after the burglary and the evidence he collected through interviews with each of the suspects, he developed a theory of the burglary. (T. at 197-203). Detective Moore concluded that there were four (4) perpetrators inside the house, which is how so much destruction occurred in likely a small amount of time. (T.at 202). He further concluded that the front door was barricaded because the perpetrators knew the Fergusons only used the front door. (T. at 203). He testified that Ms. Macomber and William Larrison had been studying the residence for a period of time, reached out to the other individuals, and told them to burglarize the house in the early morning hours. (T. at 229). Detective Moore concluded that Ms. Macomber's watching the house was integral to the burglary because she knew that the Fergusons only used their front door and therefore, the burglars barricaded the front door "for that reason and that purpose only." (T. at 251). When asked follow-up questions by the court, however, Detective Moore admitted that he formed this theory based on two (2) prior cases that he had worked. He did not cite direct evidence from this incident to support that theory. (T. at 252).

{¶16} While interviewing Ms. Macomber, Detective Moore told her she was not going to jail. (T. at 240). He also kept telling Ms. Macomber that he thought her DNA was going to be on the other pop can, enticing her to confess. (T. at 241-242). Detective Moore admitted that he lied to Ms. Macomber during her interview by telling her that

William Larrison had told them, "everything," when in fact, he provided no substantive information at all. (T. at 239). Detective Moore further admitted that he lied when he told Ms. Macomber that "everyone had told on themselves." (T. at 241).

{¶17} William Larrison gave no statement, Levi Larrison denied any involvement at all, and Detective Moore had not yet interviewed Ralph Burris. (T. at 239, 241). The only co-defendant who had provided any information up to that point was Robert Miller who wrote in his statement, "[t]his day early in December before Christmas Levi and Ralph came and picked something took me and them to Bill's house and we walked down the street to a house that they had been watching meaning Bill possibly Levi and maybe even Bill's girlfriend who he resides with." (T. at 238). Mr. Miller never mentioned Ms. Macomber by name and spoke of no other involvement she may have had in the burglary. (T. at 238-239).

{¶18} The Tuscarawas County Grand Jury indicted Appellant, Mellisa Macomber, on one (1) count of complicity to burglary, pursuant to R.C. §2923.03(A)(2) and R.C. §2911.12(A)(3),  a felony of the third degree, and one (1) count of petty theft, pursuant to R.C. §2913.02(A)(I), a misdemeanor of the first degree.

{¶19} The case proceeded to a jury trial on January 30, 2018. Prior to the commencement of trial and upon motion of the State, the court dismissed the count of petty theft. (T. at 4-6).

{¶20} In its initial remarks to the venire, the court noted that Ms. Macomber allegedly had four (4) co-defendants. (T.1 at 22). The court advised the venire that co-defendant William Larrison was acquitted of burglary at a jury trial, co-defendants Robert Miller and Ralph Burris entered pleas of no contest and were found guilty of the charge

of burglary and related charges, and co-defendant Levi Larrison had not been served with the indictment in the case. (T. at 22-23).

**{¶21}** On January 31, 2018, the jury found Ms. Macomber guilty of complicity to burglary. The court ordered a presentence investigation. (T. at 303-305).

**{¶22}** On March 15, 2018, Ms. Macomber appeared before the court for a sentencing hearing. The court sentenced Ms. Macomber to serve two (2) years of supervision under the Community Corrections Program, including six (6) months in the Tuscarawas County Jail. (Sent. T. at 3-4). The court stayed Ms. Macomber's sentence pending appeal. (Sent. T. at 15).

**{¶23}** Appellant now appeals, assigning the following error for review:

<u>ASSIGNMENT OF ERROR</u>

**{¶24}** "I. APPELLANT'S CONVICTION WAS AGAINST THE SUFFICIENCY AND/OR MANIFEST WEIGHT OF THE EVIDENCE."

I.

**{¶25}** In her sole Assignment of Error, Appellant argues that her conviction was against the manifest weight and sufficiency of the evidence. We disagree.

**{¶26}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds, State v. Smith,* 80 Ohio St.3d 89 (1997), fn.4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones,* 1st Dist. Hamilton Nos. C–120570 and C–120571, 2013–Ohio–4775, ¶ 33, citing *State v. Williams,* 197 Ohio App.3d 505, 2011–Ohio–6267, ¶ 25 (1st Dist.). *See also State v. Berry,* 3d Dist. Defiance No. 4–12–03, 2013–Ohio–2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶27} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass,* 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller,* 3d Dist. Allen No. 1–11–34, 2012–Ohio–5233, ¶ 9, quoting *State v. Hunter,* 131 Ohio St.3d 67, 2011–Ohio–6524, ¶119.

**{¶28}** Appellant was convicted of complicity to burglary. R.C. §2911.12, Ohio's burglary statute, provides, in relevant part:

(A) No person, by force, stealth, or deception, shall do any of the following:

\* \* \*

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense \* \* \*.

**{¶29}** R.C. §2923.03, Ohio's complicity statute, provides, in relevant part:

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

\* \* \*

(2) Aid or abet another in committing the offense \* \* \*.

**{¶30}** R.C. 2923.03(A)(2).

**{¶31}** The Supreme Court of Ohio in *State v. Johnson* defined how a defendant may be convicted of complicity by aiding and abetting:

**{¶32}** To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime. 93 Ohio St.3d 240 (2001),

syllabus. *See also State v. Schaeffer,* 3d Dist. Seneca No. 13–14–34, 2015–Ohio–3531, ¶ 18, quoting *Johnson* at syllabus. " 'Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed .' " *State v. Rowe,* 3d Dist. Seneca No. 13–10–14, 2011–Ohio–5739, ¶ 32, quoting *State v. Gragg,* 173 Ohio App.3d 270, 2007–Ohio–4731, ¶ 21 (12th Dist.).

**{¶33}** While Appellant argues that she played no active role in the burglary, we find that the evidence as testimony at trial support the jury's finding that she aided and abetted in the commission of the burglary.

**{¶34}** At trial, the state presented the testimony of the victims, Officer Stearns, Chief Ross, and Det. Moore as set forth above. Appellant, in her interview with the police, admitted that she watched the victim's home for three days prior to the burglary. (T. at 231, 250-251). She admitted that she discussed the burglary with her boyfriend, William Larrison. (T. at 233). Further, on the day of the burglary, all of the actors in the burglary met at her house which she was present. (T. at 232). Additionally, after the burglary, the actors returned to her home with the stolen property and divided up the stolen goods, with Appellant present. (T. at 233, 251). Appellant also took the police to her home and collected items identified as stolen by the victims. (T. at 142, 150, 163-164180-184, 223-227).

**{¶35}** As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries,* 5th Dist. Stark No. CA–5758, 1982 WL 2911 (Feb. 10,

1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). The Ohio Supreme Court has emphasized: " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012–Ohio–2179, *quoting Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g ., In re Brown,* 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass,* 10 Ohio St .2d 230, 227 N.E.2d 212 (1967).

**{¶36}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.' " *State v. Pallai,* 7th Dist. Mahoning No. 07 MA 198, 2008–Ohio–6635, ¶ 31, *quoting State v. Woullard,* 158 Ohio App.3d 31, 2004–Ohio–3395, 813 N.E.2d 964 (2nd Dist.2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, *citing State v. Gore,* 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist.1999).

**{¶37}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter,* 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 118. *Accord, Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶38}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the [trier of fact] may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens,* 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the [trier of fact] need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke,* 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell,* 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

**{¶39}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. The judge neither lost his way nor created a miscarriage of justice in convicting Macomber of the charges.

**{¶40}** Based upon the foregoing and the entire record in this matter, we find Appellant's conviction is not against the manifest weight of the evidence. This Court will not disturb the trier of fact's finding so long as competent evidence was present to support it. *State v. Walker,* 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Appellant's guilt.

**{¶41}** Appellant's sole assignment of error is overruled.

**{¶42}** For the foregoing reasons, the judgment of the Court of Common Pleas, Tuscarawas County, Ohio, is affirmed.

By: Wise, John, P. J.

Gwin, J., and

Wise, Earle, J., concur.

JWW/d 0107